People v Njoku (2023 NY Slip Op 03952)

People v Njoku

2023 NY Slip Op 03952

Decided on July 27, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 27, 2023

112168 
[*1]The People of the State of New York, Respondent,
v
Prince Njoku, Appellant.

Calendar Date:June 7, 2023

Before:Lynch, J.P., Clark, Pritzker, Reynolds Fitzgerald and Fisher, JJ. 

Marlene O. Tuczinski, Chatham, for appellant.
Michael A. Korchak, District Attorney, Binghamton (Geoffrey B. Rossi of counsel), for respondent.

Pritzker, J.
Appeal from a judgment of the County Court of Broome County (Kevin P. Dooley, J.), rendered September 13, 2019, upon a verdict convicting defendant of the crime of rape in the first degree.
Defendant was charged by indictment with rape in the first degree arising from sexual activity with a victim who was allegedly unable to consent due to physical helplessness. Following a jury trial, defendant was convicted as charged. Defendant was thereafter sentenced to a prison term of eight years with five years of postrelease supervision. Defendant now appeals.
Defendant does not dispute that he had a sexual encounter with the victim. Rather, he argues that she was not "physically helpless," and was thus able to give consent when the encounter occurred and, as such, the verdict is against the weight of the evidence.[FN1] "Physical helplessness is present when 'a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act' " (People v Dunham, 172 AD3d 1462, 1463 [3d Dept 2019] [citation omitted], lv denied 33 NY3d 1068 [2019], quoting Penal Law § 130.00 [7]). "It is well settled that a person who is sleeping is physically helpless for the purposes of consenting to sexual intercourse, particularly where the sleep was drug and alcohol induced" (People v Williams, 40 AD3d 1364, 1366 [3d Dept 2007] [internal quotation marks and citation omitted], lv denied 9 NY3d 927 [2007]; see People v Bjork, 105 AD3d 1258, 1260 [3d Dept 2013], lv denied 21 NY3d 1040 [2013], cert denied 571 US 1213 [2014]).
The victim, who was living in North Carolina at the time, was in the City of Binghamton, Broome County, her hometown, visiting two of her friends. The evening of the incident, the victim and three of her friends were at the victim's father's house getting ready to go out for the evening. The victim testified that she had approximately four alcoholic drinks before the friends left to go downtown and that, on the way downtown, she was "pretty drunk." One of the victim's friends testified at trial that, after arriving at the bar, the victim had between four and five drinks. The victim testified that, at some point in the evening, she felt tired and closed her eyes, falling asleep while she sat in a booth upstairs at the bar. The next thing she remembered is feeling sick and walking out of the building with defendant, who helped her walk down a flight of stairs to exit the bar. The victim testified that she got into the back seat of someone's car — she did not know whose — with defendant and threw up again in the car. She also recalled being in a room with defendant, telling him that she wanted to go to sleep. She testified that the next thing she remembered was waking up because she felt like she was going to vomit again and that defendant was engaging in sexual intercourse with her. She explained that, when she woke up, she felt "uncomfortable" and "like there was something inside of [her] stomach." She did not have any clothes [*2]on and did not know how they had come off. She testified that she asked defendant to stop three times before he did so. The victim stated that the next thing she remembered is being shaken and screamed at by one of her friends. She also recalled that she couldn't move and just wanted to sleep. The victim testified that she also remembered getting into another car and going to her father's house, where she fell asleep on the couch. She woke up around 11:00 in the morning and, after speaking with her friend who stayed with her overnight, the victim called defendant. Defendant told the victim that she threw up on him and that they had sex. Soon thereafter, defendant sent the victim a message on Instagram stating, "I'm not sure if you blocked me on Snap[chat] because of what happened last night. But I haven't and will not tell anyone what we did. And if you ever need to talk[,] I'm still here. I'm not mad and I didn't completely tell you everything about last night because that's something I'm not going to say over the phone. I'm sorry if I did anything to make our relationship awkward. I wasn't in the right state of mind."
Some of the victim's friends who were present with her at the bar on the night of the incident all testified as to the victim sleeping in a booth upstairs at the bar, only waking when she went to the bathroom to vomit. They also testified that defendant helped her walk down the stairs of the bar. There was testimony that, when the victim's friends came outside, the victim and defendant were nowhere to be seen. One friend was able to check the victim's location on her phone and it appeared that she was at defendant's house. After driving to defendant's house, two of the friends went into the house looking for the victim. One of these friends proceeded to the upstairs of the house, yelling the victim's name and checking all the bedrooms. She found the victim "passed out" naked on the bed and testified that defendant was standing in a corner, naked, using his phone. The friend testified that it took three to five minutes of shaking the victim and screaming her name before she woke up. While the friend got the victim dressed, the victim was moaning and groaning, but not saying anything. The victim was unable to walk out of the house, so defendant picked her up and carried her out to the car. The friend described the victim as being limp and "kind of unconscious" while being carried to the car, and that she was not responsive to questions on the way home. The friend also testified that the victim did not say anything on the drive home except that her vagina hurt.
Defendant's testimony regarding the night of the incident was largely similar to that of the victim's, with the exception of his testimony regarding the victim's condition and his account of the sexual encounter. Defendant testified to also having consumed alcohol throughout the night, as he went between two bars, including the bar where the victim was. He testified that, [*3]the first time he saw the victim that night, she was in a booth asleep. He ran over and took out his phone to record her for Snapchat, as a joke. He testified that she woke up and they had a brief conversation just before she went to the bathroom to vomit. Defendant testified that when they left the bar the victim was walking on her own and talking to people without slurring her speech. He also explained that she seemed wide awake after having vomited. Defendant testified that the victim asked to go to his house, which they did. He stated that, once they were in his bedroom, he placed the victim on the bed where she said to put her to sleep and asked for help removing her clothes, which he did. He testified that, soon after they got into bed, the victim initiated a kiss, which progressed to the two having sexual intercourse. He explained that she stopped while they were having sex saying that she had to vomit and that, after she threw up, they fell asleep. He testified that the victim stated that she felt bad about stopping, so she said that she would wake him up with oral sex and that they would have sex again. Defendant testified that all of this occurred within 10 minutes of arriving at his house. Defendant was subsequently woken up by banging on the door and shouting, which was one of the victim's friends. The friend came into the room and was trying to wake up the victim, which took a few minutes. Once she was awake, defendant tried to help her get dressed. Defendant explained that the victim and her friend were hanging onto each other because they were both drunk, so defendant picked the victim up, carried her outside and put her into a car.
The foregoing testimony "presented 'a classic he-said she-said credibility determination' for the jury to resolve" (People v Kiah, 156 AD3d 1054, 1056 [3d Dept 2017], lv denied 31 NY3d 984 [2018], quoting People v McCray, 102 AD3d 1000, 1000 [3d Dept 2013], affd 23 NY3d 193 [2014]). As such, a different verdict would not have been unreasonable. Significantly, "[t]he state of the victim's physical helplessness at any given moment is largely a question of fact and, after listening to defendant and the victim on that issue, the jury credited the proof that the victim was physically helpless at [the] relevant time[ ]" (People v Dunham, 172 AD3d at 1464 [internal quotation marks and citation omitted]). "Accordingly, 'viewing such evidence in a neutral light and weighing the competing inferences that could be drawn therefrom, we are satisfied that the verdict as rendered is supported by the weight of the evidence' " (People v Mesko, 150 AD3d 1412, 1414 [3d Dept 2017], lv denied 29 NY3d 1131 [2017], quoting People v Judware, 75 AD3d 841, 845 [3d Dept 2010], lv denied 15 NY3d 853 [2010]; see People v Dunham, 172 AD3d at 1464; People v Sposito, 140 AD3d 1308, 1310 [3d Dept 2016], affd 30 NY3d 1110 [2018]).
Defendant asserts that County Court abused its discretion in admitting his cell phone into evidence and [*4]in allowing testimony regarding the subject phone. "Generally, all relevant evidence is admissible unless its admission violates some exclusionary rule[, and] [e]vidence is considered relevant if it has any tendency in reason to prove the existence of any material fact" (People v Nicholson, 26 NY3d 813, 829 [2016] [internal quotation marks and citations omitted]). Despite defendant's argument to the contrary, his cell phone was relevant inasmuch as there was testimony that defendant was seen with a cell phone in his bedroom while the victim was asleep on his bed naked, as well as testimony that defendant and the victim communicated through both Snapchat and Instagram. Although information ultimately could not be retrieved from defendant's cell phone, its admission and related testimony regarding attempted data extraction was proffered to show the due diligence of law enforcement and explain the lack of evidence (see generally People v Mirenda, 23 NY2d 439, 453 [1969]; People v Roldos, 161 AD2d 610, 610 [2d Dept 1990], lv denied 76 NY2d 864 [1990]). Nor do we agree with defendant's contention that the cell phone was not properly authenticated inasmuch as the detective who obtained the cell phone from defendant properly authenticated it (see generally People v Pleasant, 149 AD3d 1257, 1258-1259 [3d Dept 2017], lv denied 30 NY3d 1022 [2017]; People v Roblee, 83 AD3d 1126, 1127 [3d Dept 2011], lv denied 17 NY3d 809 [2011]). To the extent that defendant is arguing that testimony regarding the cell phone screen being cracked or the detective's inability to obtain data from the phone led to an inference that defendant damaged the cell phone to prevent law enforcement from opening it, at no point did County Court instruct the jury regarding an inference to be drawn from this testimony, nor did the People, in their summation, make any such argument (see generally People v Berry, 27 NY3d 10, 16-17 [2016]; compare People v Vargas, 86 NY2d 215, 224 [1995]). Therefore, County Court did not err in allowing defendant's cell phone and related testimony into evidence.
Defendant next asserts that he received ineffective assistance of counsel due to multiple alleged failings, none of which we find persuasive. "A claim of ineffective assistance of counsel must be supported with proof that the attorney failed to provide meaningful representation and that there were no strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v Clark, 209 AD3d 1063, 1065 [3d Dept 2022] [internal quotation marks, brackets and citations omitted], lv denied 39 NY3d 1140 [2023]). As to defendant's argument that counsel failed to cross-examine Eike Blohm, an emergency medicine physician, who testified as an expert for the People regarding the general stages of intoxication,[FN2] defendant has failed to establish that counsel's decision to forgo cross-examination was not strategic, especially given the generalized testimony given by this witness, rather than [*5]specific opinions about whether the victim herself was physically helpless due to intoxication (see People v Wallace, 60 AD3d 1268, 1270 [4th Dept 2009], lv denied 12 NY3d 922 [2009]). Although defendant, in his brief, poses many questions that he, in hindsight, perceives should have been asked of this witness (see People v Philbert, 267 AD2d 607, 608 [3d Dept 1999], lv denied 94 NY2d 905 [2000]), many of these questions, or the general tenor of these questions, were posed to other of the People's witnesses during cross-examination. Relatedly, defendant argues that counsel was ineffective for failing to call an expert to challenge the People's theory that the victim was unconscious. However, defendant has failed to demonstrate that this was not a strategic decision, especially given the defense theories of the case presented by counsel (see generally People v Sposito, 193 AD3d 1236, 1240 [3d Dept 2021], affd 37 NY3d 1149 [2022]). Specifically, counsel set forth the specific theory that the victim's testimony that she did not consent was not credible, which an expert would not be able to assist with. Counsel also focused on the inconsistencies in the testimony of the People's witnesses as to the number of drinks the victim consumed, which would not give an expert a basis to render an opinion that would be helpful.
Additionally, defendant alleges ineffective assistance due to counsel's failure to object to testimony about the "sudden onset of [the victim's] sleepiness and vomiting." Again, given the focus of counsel's defense on the differing accounts of the timelines and number of drinks consumed by the victim, it appears to be a strategic decision not to object to this testimony, especially given that not all the witnesses testified to this "sudden onset." "In view of the evidence and the nature of the charge[ ] against defendant, counsel's decision 'reflected an objectively reasonable and legitimate trial strategy under the circumstances' " (id. [brackets and citations omitted], quoting People v Berroa, 99 NY2d 134, 138 [2002]). Finally, defendant's remaining contention regarding ineffective assistance of counsel is that counsel failed to object to allegedly improper questions during voir dire. However, because we do not find the People's questions to be improper or prejudicial, defense counsel's failure to object to such questions does not render his assistance ineffective (see People v Horton, 181 AD3d 986, 997 [3d Dept 2020], lv denied 35 NY3d 1045 [2020]). Accordingly, "when evaluating the totality of counsel's representation, considering whether counsel made appropriate motions, set forth a cogent defense theory, interjected viable objections, conducted meaningful cross-examination, gave an effective summation and otherwise presented a zealous defense, we cannot conclude that defendant was deprived of meaningful representation" (People v Lorenz, 211 AD3d 1109, 1113 [3d Dept 2022] [internal quotation marks, brackets and citations omitted], [*6]lv denied 39 NY3d 1112 [2023]).
To the extent preserved, we find no merit to defendant's contention that County Court improperly assisted the People at trial. Many of the interactions specified by defendant involved the court stopping repetitive questions or precluding the introduction of irrelevant matters. In terms of questioning witnesses, County Court did so for the sake of clarity and to ensure that a proper foundation was made prior to the introduction of evidence. Despite defendant asserting that the court allegedly favored the People, the court sustained several defense objections to the People asking leading and improperly formed questions. The record does not demonstrate any instances of acrimonious exchanges between the court and the defense, or a bias of any kind. Therefore, the court properly exercised its judicial role (see People v Vazquez, 145 AD3d 1268, 1271 [3d Dept 2016]; People v Lupo, 92 AD3d 1136, 1138 [3d Dept 2012]).
Finally, we reject defendant's contention that his sentence is harsh and excessive. Initially, defendant's argument that County Court punished him for invoking his constitutional right to testify at trial is unpreserved for this Court's review as it was not raised at sentencing (see People v Martinez, 144 AD3d 1326, 1326 [3d Dept 2016], lv denied 28 NY3d 1186 [2017]). In any event, we have carefully reviewed the court's comments made during the sentencing proceeding and do not find that the court considered any inappropriate factors in imposing the sentence. Moreover, it is clear that the court considered that defendant had no prior criminal history and had a supportive community of friends and family in deciding to sentence defendant to eight years, which was not much more than the minimum sentence of five years that could have been imposed (see Penal Law § 70.02 [1] [a]; [3] [a]). Given the seriousness of the offense and comments made to the Probation Department during the presentence interview and at sentencing that demonstrate his unwillingness to accept responsibility as well his lack of remorse, we decline to modify the sentence (see People v Franklin, 216 AD3d 1304, 1313 [3d Dept 2023]; People v Almenteros, 214 AD3d 1027, 1031 [3d Dept 2023], lv denied ___ NY3d ___ [June 18, 2023]; People v Bateman, 212 AD3d 993, 998 [3d Dept 2023], lv denied 39 NY3d 1140 [2023]; see generally People v Casalino, 204 AD3d 1078, 1083 [3d Dept 2022], lv denied 38 NY3d 1070 [2022]; People v Patterson, 199 AD3d 1072, 1076 [3d Dept 2021], lv denied 37 NY3d 1163 [2022]). Lynch, J.P., Clark, Reynolds Fitzgerald and Fisher, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Defendant's contention that the verdict is not supported by legally sufficient evidence is unpreserved inasmuch defendant, in his trial order of dismissal, "fail[ed] to identify the specific ground[ ] now raised on appeal in his general motion to dismiss" (People v Doane, 212 AD3d 875, 876 [3d Dept 2023], lv denied 39 NY3d 1154 [2023]). "In any event, when reviewing a defendant's weight of the evidence challenge, we ensure that the proof submitted supports the elements of the crime[ ]" (People v Agan, 207 AD3d 861, 863 [3d Dept 2022] [internal quotation marks, brackets and citations omitted], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]).

Footnote 2: Defendant also asserts that County Court erred in allowing this witness to testify, to which counsel did not object. However, given that this Court has ruled that expert testimony of this nature is admissible in cases dealing with physical helplessness (see e.g. People v Dunham, 172 AD3d at 1465-1466; People v Sposito, 140 AD3d at 1309-1310), counsel cannot be faulted for failing to make an objection that would have had little or no chance of success (see People v Chappell, 198 AD3d 1018, 1020-1021 [3d Dept 2021], lv denied 37 NY3d 1160 [2022]; People v Leonard, 177 AD3d 1158, 1163 [3d Dept 2019], lv denied 34 NY3d 1160 [2020]).